UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

ARIEL E. BELEN, as Temporary Co-Trustee of the
Trust created by Harold Herman dated March 1, 1990
and as Temporary Trustee of the Trust created by
Rosemarie Herman dated November 27, 1991,
and ROSEMARIE HERMAN, as Co-Trustee of the
Trust created by Harold Herman dated March 1, 1990,

Case No. 22-cv-6455 (AKH)

**Jury Trial Demanded**

**SECOND AMENDED
COMPLAINT**

Plaintiffs,

-against-

JULIAN M. HERMAN, ROCLA, LLC, ROCLAB, LLC,
THE VANGUARD GROUP, INC., OAKWORTH
CAPITAL BANK, DENTONS SIROTE, PC,
and HOWARD NEISWENDER,

Defendants.

------------------------------------------------------------------------X

Plaintiffs Ariel E. Belen, as Temporary Co-Trustee of the Trust created by Harold Herman

for the benefit of, among others, Rosemarie Herman, dated March 1, 1990 (the "1990 Trust"), and

as Temporary Trustee of the Trust created by Rosemarie Herman dated November 27, 1991 (the

"1991 Trust"), and Rosemarie Herman, as Co-Trustee of the 1990 Trust (collectively, the

"Plaintiffs"), by their attorneys, Jaspan Schlesinger Narendran LLP, complaining of defendants

Julian M. Herman (the "Judgment Debtor"), Rocla, LLC ("Rocla"), Roclab, LLC ("Roclab"), The

Vanguard Group, Inc. ("Vanguard"), Oakworth Capital Bank ("Oakworth"), Dentons Sirote, PC

("Sirote"), and Howard Neiswender ("Neiswender" and, collectively with the Judgment Debtor,

Vanguard, Oakworth, and Sirote, the "Defendants"), allege as follows:

**Nature of the Action**

1.      On September 19, 2017, a judgment was granted by the Supreme Court of the State

of New York against the Judgment Debtor in favor of Plaintiffs in the sum of $103,637,208.44,

together with applicable interest (the "Judgment"). The Judgment arose from the Judgment Debtor's acts to defraud his sister Rosemarie Herman ("Rosemarie") out of her one-half interest in six (6) prime Manhattan apartment buildings that were owned in trust for the benefit of Rosemarie and her children.

2.      This action concerns the Judgment Debtor's scheme, in cooperation with the other Defendants, to continue his fraud on Rosemarie and her children by concealing his assets and transferring them out of Plaintiffs' reach in order to hinder, delay and prevent their enforcement of the Judgment. The conspiracy involved the formation of more than a dozen entities wholly-owned and controlled by the Judgment Debtor and his attorney, Neiswender, and the use of those entities for the singular purpose of concealing, transferring, and encumbering his assets to defraud Plaintiffs (the "Scheme").

3.      The Judgment Debtor and Neiswender conspired with Vanguard and Oakworth to use blatantly fraudulent bank and brokerage accounts to conceal approximately $150 million in assets owned by the Judgment Debtor, and to liquidate and transfer the assets to bank accounts located in Liechtenstein and beyond. In addition, the Judgment Debtor and Neiswender conspired to use fraudulent loans and mortgages to encumber the Judgment Debtor's real property. The Judgment Debtor also attempted to devalue the building known as 952 Fifth Avenue, New York, New York ("952 Fifth") by fraudulently recording a 99-year lease agreement for that property.

4.      Vanguard and Oakworth were not mere victims or pawns in the Scheme, but rather were complicit participants, with knowledge of the Judgment Debtor's fraudulent purpose.

5.      The Judgment Debtor retained Neiswender no later than August 2015 when it became apparent that he would lose the pending litigation and face a substantial Judgment in Plaintiffs' favor. At that time, there was a determination by the Court that the Judgment Debtor

was liable to Plaintiffs, with a calculation of damages to await an inquest.

6.      Neiswender touts his expertise in helping clients protect their assets from creditors, and specifically in speeches and presentations recommends offshore bank accounts in the Cook Islands and Nevis, among other locations.

7.      Over the course of several months, the Judgment Debtor and Neiswender formed multiple limited liability companies and trusts, organized principally in Delaware, South Dakota, Nevada, or Wyoming, each with multiple membership layers to obscure their ownership by the Judgment Debtor.

8.      Of particular relevance to this action, in December 2015 the Judgment Debtor, with Neiswender's assistance, formed Rocla and Roclab as South Dakota limited liability companies. Rocla and Roclab were wholly owned and managed by two other entities, which were, in turn, managed by Neiswender.

9.      In April 2016, the Judgment Debtor, again with Neiswender's assistance, opened brokerage accounts at Vanguard in the names of Rocla and Roclab, initially submitting paperwork identifying himself as the account owner, and using his legal name, Julian M. Herman, and social security number.

10.     The very next day, the Judgment Debtor and Neiswender directed Vanguard to close those accounts, and subsequently submitted paperwork to open two *new* accounts for Rocla and Roclab, this time **changing his purported given name** to his middle name, Maurice, and **using a false social security number**.  Vanguard accepted the paperwork to open the new accounts, knowing that the information was false.

11.     Although the Judgment Debtor was the sole authorized signatory, Neiswender directed Vanguard, in writing, to conceal the Judgment Debtor's control of the accounts.  Vanguard

complied with that directive.

12.    In or about May 2016, the Judgment Debtor transferred securities, valued at more than $150 million, from accounts at UBS Securities, Inc. ("UBS") to the Rocla and Roclab accounts at Vanguard.  Vanguard knew that the primary source of the transferred funds was the Judgment Debtor's self-settled revocable trust. In other words, Vanguard knew that the funds in the Rocla and Roclab accounts were the Judgment Debtor's own assets.

13.    On or about September 27, 2017, immediately following entry of the Judgment, Plaintiffs served a restraining notice on Vanguard (the "2017 Restraining Notice").

14.    The 2017 Restraining Notice required Vanguard to *restrain all accounts in which the Judgment Debtor had an ownership interest or for which he was a signatory*, including any fictitious entities unknown to the judgment creditors.  The 2017 Restraining Notice prohibited Vanguard from transferring any assets out of such accounts.

15.    Vanguard purported to have complied with the 2017 Restraining Notice and accompanying information subpoena (the "2017 Information Subpoena"), which demanded information about any accounts for which the Judgment Debtor "may have an interest, whether under the name of the debtor, under a trade or corporate name, or in association with others, as of the date of the subpoena or within three (3) years prior thereto, including but not limited to any account for which the judgment debtor has or had signatory power."

16.    At the time, the Rocla and Roclab accounts at Vanguard, on which the Judgment Debtor was the sole authorized signatory, contained assets valued at more than $150 million belonging to the Judgment Debtor.

17.    Vanguard, however, falsely responded to the 2017 Information Subpoena, claiming to have no open accounts.  Upon information and belief, Vanguard, in a conspiracy with the

Judgment Debtor and Neiswender, ***willfully and intentionally concealed from Plaintiffs the existence of the Rocla and Roclab accounts***.

18.     Two weeks ***after*** falsely claiming in response to the 2017 Information Subpoena that it held no accounts in which the Judgment Debtor had an interest or for which he had signatory power, Vanguard, at the Judgment Debtor's and Neiswender's direction, liquidated all assets in the Rocla and Roclab accounts, totaling approximately $150 million.

19.     Vanguard, at the Judgment Debtor's direction and despite the existence of the 2017 Restraining Notice, then immediately transferred most of those assets to newly opened accounts at Oakworth—a small bank in Birmingham, Alabama with which Neiswender, also based in Birmingham, had a preexisting relationship.

20.     Upon information and belief, Vanguard knew that the transactions in the Rocla and Roclab accounts were undertaken for the sole purpose of concealing the Judgment Debtor's assets from Plaintiffs, and that he intended to further transfer the funds offshore.  Indeed, the Judgment Debtor initially requested that Vanguard transfer the funds in the Rocla and Roclab accounts to an account in Liechtenstein, a known safe haven for protecting assets against foreign judgments. Vanguard declined, yet agreed to transfer the assets to Oakworth, an obscure bank in Alabama.

21.     Within weeks of receiving the Judgment Debtor's assets, Oakworth, at the Judgment Debtor's and Neiswender's direction, made fifteen (15) separate wire transfers, each in the amount of $10 million, to an account located in Liechtenstein.  These transactions were well out of the ordinary course of business for a small institution like Oakworth.

22.     In 2017, Oakworth reported holding approximately $500 million in customer assets. Vanguard's transfer to Oakworth of $150 million increased the assets held by Oakworth by approximately one-third and was, upon information and belief, an extraordinary transaction.

23.     Oakworth's employees, who raised concerns about the highly unusual transactions they were being asked to handle, were instructed to abide by Neiswender's and the Judgment Debtor's directives.

24.     Upon information and belief, Neiswender routinely utilizes his relationship with Oakworth to aid debtors in defrauding creditors by hiding their funds.

25.     Vanguard's and Oakworth's complicity in the Scheme is underscored by their utter failure to comply with well-established requirements imposed on banks and broker-dealers pursuant to the Anti Money Laundering ("AML") laws encompassed in the Bank Secrecy Act ("BSA"), and their implementing regulations.

26.     Under the AML laws, all financial institutions are required to maintain and implement policies, procedures and internal controls designed to prevent, detect and report suspicious activity.  Specifically, AML programs are required to have appropriate risk-based procedures for conducting customer due diligence.  Financial institutions must have customer identification procedures that identify the beneficial owners of legal entity accounts. They also must monitor transactions for potentially suspicious activity. When immediate attention is warranted, such as when unusually large sums are about to be transferred, financial institutions are expected to inform law enforcement authorities.

27.     To the extent Vanguard and Oakworth had appropriate AML compliance programs in place, they should have uncovered the fraudulent nature of the Rocla and Roclab accounts and the transactions, and refused to conduct such extraordinary transfers of the Judgment Debtor's assets.  Instead, they apparently turned a blind eye, despite their duty to ensure AML compliance.

28.     Based upon the blatantly fraudulent nature of the accounts and transactions, and red flags raised by rank and file employees, Vanguard and Oakworth not only failed to comply with

their AML obligations, but had to have done so *intentionally*.

29.    Moreover, Vanguard was obligated by the 2017 Restraining Notice to restrain the Rocla and Roclab accounts, and was required to disclose their existence (as well as the existence of the original accounts that were opened and quickly closed) in response to the 2017 Information Subpoena.  Vanguard therefore had *multiple* bases upon which to refuse to liquidate the Judgment Debtor's securities and to transfer the assets.  Yet, Vanguard did so with no apparent concern.

30.    While the Judgment Debtor and Neiswender conspired with Vanguard and Oakworth to secrete and transfer the Judgment Debtor's substantial liquid assets, they simultaneously conspired to conceal and fraudulently encumber the Judgment Debtor's real property to shield it from enforcement of the Judgment.

31.    The transfer of the liquid assets and encumbrance of the real property were part of the same Scheme with the common purpose of delaying, hindering, and defrauding Plaintiffs, as well as other judgment creditors.

32.    The Scheme was implemented in furtherance of the Judgment Debtor's original fraud against his sister, which resulted in the Judgment that Plaintiffs are seeking to satisfy.

33.    To date, approximately $128 million remains outstanding on the Judgment.  But for Defendants' participation in the Scheme, Vanguard's egregious violation of the 2017 Restraining Notice and intentionally false response to the 2017 Information Subpoena, and Vanguard's and Oakworth's apparent deliberate disregard of AML compliance programs, the Judgment would have been satisfied years ago.

## The Parties

34.    Plaintiff Belen is the Temporary Trustee of the 1991 Trust, and a Temporary Co-Trustee of the 1990 Trust.  Belen is a citizen of the State of New York.

35.    Plaintiff Rosemarie is the Judgment Debtor's sister, Co-Trustee and an income beneficiary of the 1990 Trust. Rosemarie is also an income beneficiary of the 1991 Trust. Rosemarie is a citizen of the State of New York and a resident of the County of New York.

36.    Upon information and belief, the Judgment Debtor (defendant Julian M. Herman) is an individual domiciled in the State of Florida.

37.    Rocla is a South Dakota limited liability company and, upon information and belief, is a citizen of the State of Alabama, because its sole member, EntityA, LLC, is a citizen of the State of Alabama.

38.    Roclab is a South Dakota limited liability corporation and, upon information and belief, is a citizen of the State of Alabama, because its sole member, EntityB, LLC, is a citizen of the State of Alabama.

39.    Upon information and belief, Vanguard is a business corporation organized and existing under the laws of the State of Pennsylvania and routinely conducts business in the State of New York.

40.    Upon information and belief, Oakworth is a banking organization existing under the laws of the State of Alabama, with a principal place of business in Birmingham, Alabama.

41.    Upon information and belief, Sirote is a professional corporation existing under the laws of the State of Alabama.

42.    Upon information and belief, Neiswender is an individual domiciled in the State of Alabama, and a shareholder of Sirote.

## **Jurisdiction and Venue**

43.    This action was commenced in the Supreme Court of the State of New York, under Index No. 155364/2022, and was removed by Vanguard to this Court.

44.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different States.

45.     This Court has personal jurisdiction over Defendants pursuant to CPLR §§ 302(a)(1) and (a)(2), because the complaint alleges a civil conspiracy in which one or more co-conspirators committed a tortious act within the State, including, but not limited to, making fraudulent wire transfers that were routed through New York.

46.     The Court has personal jurisdiction over the Judgment Debtor, Vanguard, Rocla, and Roclab pursuant to CPLR § 302(a)(1) because they regularly transact business within the State.

47.     The Court has personal jurisdiction over Oakworth, Neiswender and Sirote pursuant to CPLR § 302(a)(3) because they committed tortious acts outside the State causing injury to property within the State.

48.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(3) because one or more Defendants is subject to the Court's personal jurisdiction with respect to the action.

<u>**Allegations Common to All Claims for Relief**</u>

A.  <u>**The Judgment Debtor's Fraud on Rosemarie**</u>

49.     For approximately twenty (20) years, the Judgment Debtor engaged in an elaborate fraud to deprive Rosemarie and her children of their 50% interest in six (6) prime residential buildings in Manhattan, which were held in trust for the benefit of Rosemarie and her children.

50.     The fraud was carried out through a series of transactions undertaken while the Judgment Debtor conspired with, among others, his friend, Michael Offit, whom he arranged in or about 1997 to be appointed as a successor trustee of both 1990 Trust and the 1991 Trust, replacing Rosemarie's mother in those roles.

51.     In furtherance of the fraud, in or about 1997, without Rosemarie's knowledge, the

Judgment Debtor transferred the properties to six (6) limited liability companies which he controlled as managing member.  On or about December 31, 1998, the Judgment Debtor acquired the trusts' interests in the limited liability companies for the paltry sum of $8 million, less than $3 million of which was supposedly paid in cash.

52.    In or about 2002, the Judgment Debtor caused five (5) of the properties to be sold in a private sale for $101,925,000.  The property located at 952 Fifth Avenue, New York, New York ("952 Fifth"), was not sold in the 2002 transaction, but was instead retained by the Judgment Debtor, and later transferred to Windsor Plaza LLC, which the Judgment Debtor owned and controlled.

53.    The Judgment Debtor's profit on the sale of the properties, which closed in January 2003, was approximately $92 million.

54.    Using documents obtained through discovery from third parties and other investigative efforts, Plaintiffs have traced the path of the fraud proceeds through multiple bank and brokerage accounts, eventually ending up in accounts last known to be titled to Rocla and Roclab.

55.    The Judgment Debtor initially invested the fraudulent sale proceeds in brokerage accounts at UBS.  In or around 2003, he moved the assets to Goldman Sachs.  In or around 2007, the Judgment Debtor transferred securities valued at $107,345,000 to J.P. Morgan Chase Bank N.A. ("Chase").  In or around early 2011, when the litigation that ultimately resulted in the Judgment was commenced, the Judgment Debtor transferred his securities, held in bonds valued at approximately $112 million, from Chase back to UBS, placing them in multiple accounts in the names of alter-ego entities under his control.

56.    Based, *inter alia,* upon documents produced by UBS in response to a subpoena, by

2015, the Judgment Debtor held the bulk of his assets, worth approximately $150 million, in an account titled to the Judgment Debtor's self-settled revocable trust, which uses the fictitious name Marstack & Co. ("Marstack"), and in an account titled to Revenue Funding Services, LLC ("RFS"), which the Judgment Debtor owns and controls.

**B.  The 2011 Action and Judgment**

57.    In January 2011, shortly after discovering the fraud in 2010, Rosemarie, as beneficiary of the 1990 Trust and the 1991 Trust, commenced an action in the Supreme Court of the State of New York, New York County (the "Supreme Court"), entitled *Rosemarie A. Herman, et al. v. Julian the Judgment Debtor Herman, et al*., Index No. 650205/2011 (the "2011 Action").

58.    By order dated July 16, 2013, the Supreme Court appointed Belen as Temporary Trustee of the 1991 Trust and the 1990 Trust.

59.    On July 13, 2015, the Supreme Court sanctioned the Judgment Debtor for egregious and pervasive discovery misconduct, striking his answer, third party claims and counterclaims and granting Plaintiffs' motion for a default judgment with respect to liability (the "Liability Default").

60.    On October 13, 2015, the Appellate Division, First Department (the "Appellate Division") unanimously denied the Judgment Debtor's motion for a temporary restraining order, preliminary injunction, and a stay, and vacated portions of an existing temporary restraining order to which the Plaintiffs had previously consented.

61.    On December 3, 2015, the Appellate Division unanimously affirmed the Liability Default.

62.    Prior to the Appellate Division's rulings regarding the Liability Default, the Judgment Debtor retained the services of attorney Neiswender, who marketed himself as having extensive experience in asset protection, including the use of complex corporate structures and

offshore trusts as a means to insulate individuals from judgment creditors.

63.    Beginning no later than August 2015, as detailed below, the Judgment Debtor and Neiswender formed a Byzantine web of trusts and limited liability companies with opaque ownership structures for the express purpose of delaying, hindering and preventing Plaintiffs from enforcing the inevitable substantial money Judgment against the Judgment Debtor.

64.     The Judgment Debtor and Neiswender, as a shareholder of Sirote, potentially together with other persons as yet unknown, concocted and implemented the Scheme.

65.    Vanguard and Oakworth were key participants in the Scheme, facilitating the liquidation and transfer of approximately $150 million outside of the country mere weeks *after* the entry of final judgment in September 2017.

66.    Lounsbury was also a key participant in the Scheme, taking a fraudulent assignment of a fraudulent lease for a multi-million dollar apartment, and entering into purported "loans" secured by the Judgment Debtor's real property, despite the fact that the Judgment Debtor was sitting on $150 million in liquid assets, for the sole purpose of delaying, hindering and preventing Plaintiffs' enforcement of the Judgment.

67.    Parenthetically, during this period, Lounsbury was under indictment for defrauding the U.S. government in connection with the sale of body armor for troops in combat.  He was convicted in 2019 and sentenced to prison.

68.    On September 26, 2017, the Supreme Court entered the Judgment against the Judgment Debtor (i) in favor of Rosemarie as Co-Trustee of the 1990 Trust and Belen as Temporary Trustee thereof, in the total sum of $24,973,652.83 with statutory interest from the date of entry of judgment at 9%; and (ii) in favor of Belen, as Temporary Trustee of the 1991 Trust, in the total sum of $78,663,555.61, with statutory interest from entry of the Judgment, at 9%.  The

Judgment further enjoined the Judgment Debtor to cause Windsor Plaza LLC, to which he had transferred 952 Fifth, to execute and record a deed conveying the property to the Judgment Debtor and to Belen, as temporary trustee of the 1991 Trust, each to hold a 50% interest as tenants in common. A true and correct copy of the Judgment is annexed hereto and made a part hereof as **Exhibit 1**.

69.     The Judgment identifies the Judgment Debtor by his legal name, Julian Maurice Herman.

### C.  <u>Neiswender Forms Rocla and Roclab</u>

70.     On or about December 8, 2015, shortly after the rulings by the Appellate Division that unanimously affirmed the Liability Default against the Judgment Debtor, Neiswender, in the course of his duties as a partner of Sirote, and acting as the Judgment Debtor's agent, prepared, executed, and submitted to the State of South Dakota Articles of Organization for Rocla and Roclab, together with accompanying documentation and the required fees.

71.     It is no coincidence that South Dakota was selected for the formation of these entities, as it has become, upon information and belief, one of the world's most infamous jurisdictions for debtors and other bad actors to attempt to conceal their money from creditors, tax collectors and law enforcement authorities.

72.     The Articles of Organization listed the address at which the entities conduct business as 2311 Highland Avenue South, Birmingham, Alabama—the address of Neiswender's law firm, which was then known as Sirote & Permutt, P.C.

73.     The Articles of Organization also identified Neiswender as the organizer, and their sole managing members as EntityA, LLC (for Rocla) and EntityB, LLC (for Roclab), respectively.

74.     Simultaneously, Neiswender submitted organizational documents to the State of

Nevada for the formation of EntityA, LLC ("EntityA"), and EntityB, LLC ("EntityB").

75.     The documents identify Neiswender as the sole manager of both EntityA and EntityB.  According to public records, Neiswender continued in that role at least through 2020.

76.     The sole members of EntityA and EntityB, respectively, were Alcor Foundation ("Alcor") and Balcor Foundation ("Balcor"), both formed by the Judgment Debtor.  Upon information and belief, Alcor and Balcor are private foundations existing pursuant to the laws of Liechtenstein and controlled by the Judgment Debtor.

77.     The Judgment Debtor was one of three board members of Alcor and Balcor.

78.     Neither Rocla, Roclab, EntityA, EntityB, Alcor nor Balcor are known to have conducted any business.

79.     Upon information and belief, Neiswender advised the Judgment Debtor to form the foregoing multi-layered corporate structures to hide his assets from Plaintiffs and other creditors.

80.     Neiswender, upon information and belief, routinely and continually promotes, packages, and sells versions of the Scheme to launder money and defraud judgment creditors.

**D.  The Judgment Debtor and Neiswender Open Rocla and Roclab**
    **Brokerage Accounts at Vanguard Using False Information**

81.     On March 24, 2016, W. Wesley Hill, an attorney and a Certified Public Accountant employed at Sirote, at the direction of Neiswender, sent two (2) letters to Vanguard (the "March 2016 Letters"), requesting to open brokerage accounts titled in the names of Rocla and Roclab, respectively.  The March 2016 Letters advised that "initial funds will be wired once the account is open."  Neiswender was copied on both letters.

82.     Enclosed with each of the March 2016 Letters was an "Account Kit," including documentation describing Rocla and Roclab as single-member limited liability companies— EntityA as the sole member of Rocla and EntityB as the sole member of Roclab.  The documents

identified Neiswender as the sole manager of EntityA and EntityB.

83.    The documentation identified "*Julian M. Herman*" as the account owner and sole authorized signatory on each account.    The Social Security number used was the Judgment Debtor's legitimate Social Security number, ending in 3771.

84.    The documentation listed the Judgment Debtor's occupation as "Real Estate Developer," and his address as "3300 S. Dixie Hwy, Ste 1-270, West Palm Beach, Florida 33405." That address was a mail drop and not an office.    The email address provided was "jmauriceherman@hotmail.com."

85.    The Judgment Debtor affixed his signature to the document, dated March 23, 2016.

86.    Enclosed with each Account Kit was a "Unanimous Written Consent in Lieu of Meeting of the Sole Manager" for each entity, dated March 24, 2016, granting "Julian M. Herman" the authority to act on the entity's behalf (the "First Consents").    The First Consents were executed by Neiswender, in his capacity as manager of EntityA, as sole member of Rocla, and as manager of EntityB, as sole member of Roclab, respectively.

87.    On April 5, 2016, Vanguard confirmed that the Rocla and Roclab accounts had been opened (the "First Rocla and Roclab Accounts").

88.    ***The following day***, on April 6, 2016, Vanguard generated correspondence confirming that the First Rocla and Roclab Accounts had been ***closed***.    Upon information and belief, the Judgment Debtor, based on Neiswender's advice, directed Vanguard to close the First Rocla and Roclab Accounts.

89.    Less than one week later, on April 11, 2016, W. Wesley Hill sent two (2) letters to Vanguard (the "April 2016 Letters"), again with copies to Neiswender, directing the opening of ***new*** accounts for Rocla and Roclab—this time using false information (the "Fraudulent Rocla and

Roclab Accounts").

90.     When the Fraudulent Rocla and Roclab Accounts were opened, Rocla and Roclab were designated as foundations rather than as single member limited liability companies.

91.     The new account opening documents identified "***Maurice J. Herman***" (and ***not*** Julian M. Herman) as the account owner and authorized signatory, with a Social Security number ending in 9469.  The Social Security number used does ***not*** belong to the Judgment Debtor.

92.     Although the documentation identifies the "authorized signatory" as "Maurice J. Herman," the signature is ***identical*** to the signature of "Julian M. Herman" on the First Rocla and Roclab Account opening documentation.  It was therefore abundantly clear that the same individual – *i.e.* Judgment Debtor – had executed both sets of documents.

93.     Enclosed with the Fraudulent Rocla and Roclab Account opening documentation was a "Written Consent in Lieu of Meeting of the Sole Manager" for each entity (the "Fictitious Consents"), identical to the First Consents except that they designate "Maurice J. Herman" as an authorized signatory, rather than "Julian M. Herman."  The Fictitious Consents, like the First Consents, were executed by Neiswender, and are dated March 23, 2016.

94.     Notwithstanding the designation of the Judgment Debtor as the account owner, Neiswender took pains to avoid any association between the Judgment Debtor and the Fraudulent Rocla and Roclab Accounts.  The April 2016 Letters directed:

> "Mr. Herman is <u>not</u> the owner of the account.  His role is solely that of a signatory on behalf of [Rocla/Roclab].  Therefore the account should be titled solely in the name of [Rocla/Roclab], and Mr. Herman's name should <u>not</u> appear in the account title, any printed checks, any account statements, or any correspondence." (Emphasis in original).

95.     Shortly after receiving the account documentation, Vanguard confirmed the opening of the Fraudulent Rocla and Roclab Accounts.

16

96.     Upon information and belief, Vanguard did not question why it had received conflicting information concerning the same entities.

97.     Upon information and belief, Vanguard did not take any steps to verify whether Rocla and Roclab were legitimate businesses, or to verify the identity of the ultimate beneficial owner of the accounts.

98.     Rocla and Roclab in fact existed for the sole purpose of holding the Judgment Debtor's assets in a disguised manner.

99.     In short, ***Vanguard opened the Fraudulent Rocla and Roclab Accounts based upon supporting documentation that contained obviously fictitious identifying information, including a false name and Social Security number.***

100.    Vanguard knew that the Judgment Debtor wanted to keep his connection to the Fraudulent Rocla and Roclab Accounts, and agreed to help him perpetuate that lie.

101.    Had Vanguard complied with its due diligence obligations under the AML laws, it would have confirmed that the Judgment Debtor was the true owner of both sets of accounts and recognized that he used false information to open the accounts.  Under the AML rule requiring a Customer Identification Program ("CIP"), the identity of the account holders ***must*** be verified. Given that a fake name and wrong Social Security number were used, no legitimate verification could possibly have been obtained by Vanguard.  The accounts should therefore not have been opened.

102.    In addition, as part of the CIP process, Vanguard was required to review the legal entities under whose names the accounts were being opened and should have seen that the entities themselves were mere shams and instrumentalities of the Judgment Debtor.

103.    The timing of the processing of the First Rocla and Roclab Accounts and the

Fraudulent Rocla and Rocla Accounts was so close that it forecloses the possibility that Vanguard was merely sloppy. Vanguard obviously agreed to abide by Neiswender's directions, and ***had to have intentionally*** ignored what was staring it in the face.

104.    Vanguard's knowledge of the Judgment Debtor's use of false information is further confirmed by additional documents. In May 2016, the Judgment Debtor submitted forms to Vanguard to approve the sending and receipt of wires from and to the Fraudulent Rocla and Roclab Accounts. He mistakenly signed the forms with his legal name, "Julian M. Herman." Subsequently, the Judgment Debtor resubmitted the forms signed as "Maurice J. Herman," stating that he was providing them at Vanguard's "request." Thus, Vanguard was not only aware of the Judgment Debtor's use of a fictitious identity, but actively and overtly assisted and participated in his duplicity.

105.    By letter dated May 23, 2016, shortly after the Supreme Court entered an order precluding the Judgment Debtor from participating in the inquest on damages due to additional discovery misconduct (the "Preclusion Order"), W. Wesley Hill forwarded documents signed by the Judgment Debtor authorizing the transfer of approximately $139,600,000 in securities from the Debtor's Revocable Trust account (using the fictitious name Marstack) at UBS to the Fraudulent Roclab Account at Vanguard, and approximately $10,700,000 from the RFS account at UBS to the Fraudulent Rocla Account at Vanguard (collectively, the "UBS Transfers"). The UBS Transfers were made on or about June 13, 2016.

106.    Significantly, Vanguard knew that the source of the funds transferred to the Fraudulent Roclab Account was a UBS account in the name of Marstack. Moreover, because Vanguard previously held an account at Vanguard in the name of Marstack (closed on April 8, 2016, just days before the opening of the Fraudulent Rocla and Roclab Accounts), Vanguard was

aware that Marstack was the Judgment Debtor's revocable trust and that the funds therefore belonged to him.

107.    Vanguard cannot profess to have been ignorant, when responding to the 2017 Information Subpoena, of the Judgment Debtor's direct interest in the funds in the Fraudulent Rocla and Roclab Accounts.

### E.  The 2017 Restraining Notice and Information Subpoena

108.    In September 2017, shortly before the Judgment was entered, Plaintiffs learned, through allegations contained in an interpleader complaint filed by UBS in the United States District Court for the Southern District of New York, that the Judgment Debtor held substantially all of his liquid assets with UBS until 2016, in accounts titled to multiple shell entities and at least one trust with a fictitious name, and transferred those assets to Vanguard in or about June 2016.

109.    On September 27, 2017, Plaintiffs served the 2017 Restraining Notice and the 2017 Information Subpoena upon Vanguard.  A true and correct copy of the 2017 Restraining Notice and the 2017 Information Subpoena is annexed hereto and made a part hereof as **Exhibit 2**.

110.    The 2017 Restraining Notice and 2017 Information Subpoena identified the judgment debtor as "Julian Maurice Herman," with a Social Security number ending in 3771 (the full Social Security number was provided).

111.    The 2017 Restraining Notice stated, in relevant part:

> **WHEREAS**, it appears that you owe a debt to the judgment debtor or are in possession or in custody of property in which the judgment debtor has an interest;
>
> **\*including but not limited to any and all accounts in your possession and/or control due to, owned by, or otherwise in which the debtor JULIAN MAURICE HERMAN, has an ownership interest, _or is a signatory_**.

> **TAKE NOTICE** that pursuant to CPLR 5222(b), which is set forth in full herein, you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with any property in which the judgment debtor has an interest, except as therein

(*See* Exhibit 2 (italics and underline added)).

112.    Vanguard had an obligation, pursuant to the 2017 Restraining Notice, to restrain the Fraudulent Rocla and Roclab Accounts, because the Judgment Debtor was identified in Vanguard's documentation as both the account owner and the sole authorized signatory.

113.    Vanguard transferred the Judgment Debtor's assets to Oakworth approximately two weeks *after* Vanguard was served with the 2017 Restraining Notice, and after it responded to the 2017 Information Subpoena omitting any mention of the accounts from which the transfers were going to be made.

114.    Vanguard had an obligation to provide a truthful response to the 2017 Information Subpoena.

115.    Vanguard served a response to the 2017 Information Subpoena dated October 3, 2017, together with a cover letter falsely stating that "[n]o open accounts in the name of Judgment debtor Julian Maurice Herman were located to restrain."  Although not required to do so by law, Vanguard copied the Judgment Debtor on its response to the 2017 Information Subpoena.  A true and correct copy of Vanguard's response is annexed hereto and made a part hereof as **Exhibit 3**.

116.    Plaintiffs relied to their detriment upon Vanguard's misrepresentation in determining their strategy to locate the Judgment Debtor's funds.

117.    Vanguard deprived Plaintiffs of critical facts that would have enabled them to discover the Fraudulent Rocla and Roclab Accounts.

118.    Question No. 9 of the 2017 Information Subpoena states as follows:

20

9.   Do you have a record of any account in which the judgment debtor may have an interest, whether under the name of the debtor, under a trade or corporate name, or in association with others, as of the date of the subpoena or *within three (3) years* prior thereto, including but not limited to any account for which the judgment debtor has *or had signatory power?* (Emphasis supplied).

119.   In response to Question No. 9, Vanguard responded, "Yes."

120.   Question No. 10 of the 2017 Information Subpoena reads as follows:

10.   As to such account, which is the exact title of the account, the date opened, amounts presently on deposit; if closed, the amount of deposit when closed and the date closed?

121.   In response to Question No. 10, Vanguard supplied intentionally misleading information, identifying a single account held by the J. Maurice Herman Revocable Trust (Marstack), opened in 2008 and closed in 2016. This was done in furtherance of the Scheme.

122.   As a direct and proximate result of Vanguard's misrepresentation that it had no record of any accounts other than the Marstack account in which the Judgment Debtor may have had an interest within three (3) years prior to the date of the 2017 Information Subpoena, despite the fact that more than $150 million in assets sat in the Fraudulent Rocla and Rocla Accounts, Plaintiffs did not take further steps to restrain the funds in those accounts.

123.   Vanguard intentionally made misstatements to conceal the existence of the Fraudulent Rocla and Roclab Accounts, on which the Judgment Debtor was the account owner and authorized signatory.

124.   Had Vanguard properly disclosed the Fraudulent Rocla and Roclab Accounts, Plaintiffs would have promptly taken steps to secure the funds in those accounts.

125.   Vanguard also intentionally failed to disclose the *First* Rocla and Roclab Accounts, which were opened and closed less than three (3) years prior to the service of the 2017 Information Subpoena, on which the Judgment Debtor (using his real, legal, name and real Social Security

number) was designated as the account owner and authorized signatory. Those accounts therefore *clearly* should have been disclosed in response to Question No. 10 of the 2017 Information Subpoena. They were not.

126. Had Vanguard properly disclosed the First Rocla and Roclab Accounts, Plaintiffs would have served a subpoena leading to the discovery of documents revealing the hidden assets.

**F.  The Judgment Debtor and Neiswender Open Accounts at Oakworth**

127. Upon information and belief, in or about September 2017, after entry of the Judgment, Neiswender, the Judgment Debtor, and Vanguard communicated regarding the Judgment Debtor's intent to liquidate his holdings in the Fraudulent Rocla and Roclab Accounts, valued at more than $150 million, and wire the funds offshore, beyond the immediate reach of judgment creditors.

128. Upon information and belief, Liechtenstein is known as a desirable location for asset protection and, upon information and belief, is hostile to recognition of foreign judgments. For that reason, the Judgment Debtor has used trusts and foundations formed under the laws of Liechtenstein, and administered by fiduciaries located there, to protect his assets. This was his plan for the assets at Vanguard.

129. Upon information and belief, Vanguard agreed to the plan, but insisted on using an intermediary to hide Vanguard's involvement in the Scheme.

130. Upon information and belief, Neiswender had numerous high-level connections and considerable influence at Oakworth, and often leveraged that relationship to secrete his clients' assets.

131. Upon information and belief, this relationship goes back many years, and was utilized in connection with the Scheme.

132.    The Judgment Debtor had a banking relationship with Oakworth *at least* as early as January 2017, when he opened four (4) accounts under fictitious names through which he conducted substantial transactions: ATB & Co. ("ATB"), PBIA & Co. ("PBIA"), IAS & Co. ("IAS"), and IDAJ & Co. ("IDAJ").

133.    ATB, PBIA, IAS and IDAJ were not legal entities, but rather alter-egos of the Judgment Debtor.

134.    The Judgment Debtor used the foregoing accounts for the sole purpose of concealing his assets from Plaintiffs and other creditors.

135.    Upon information and belief, Oakworth's relationship with the Judgment Debtor predates the opening of those accounts, and extends back to when the Judgment Debtor first retained Neiswender in 2015, shortly after the Supreme Court's entry of the Liability Default against the Judgment Debtor.

136.    On or about October 12, 2017, the Judgment Debtor, with Neiswender's assistance, opened the Rocla and Roclab accounts at Oakworth (the "Oakworth Rocla and Roclab Accounts").

137.    The Judgment Debtor was the sole authorized signatory on the accounts.

138.    Notably, the business inquiry forms generated by Oakworth for Rocla and Roclab indicated the following: "ID Match: FAILED"; "EIN Match: FAILED"; Address Match: FAILED.  Those results should have triggered further investigation which, had it been properly conducted, would have precluded Oakworth from opening the accounts.

139.    Tellingly, on the Client Information Verification Form prepared by Oakworth in collaboration with Neiswender, the number of anticipated monthly domestic and international wires was designated as "low (0-3)" and the amount of monthly cash deposits and withdrawals was indicated as "low (1k-5k)."  The BSA risk rating was determined to be "low."  Those

designations proved to be completely inaccurate in light of the size, frequency, and destinations of the Judgment Debtor's subsequent wire transfers.  The Oakworth Rocla and Roclab Accounts did not have zero to three (3) wires, totaling less than $5,000 per month; instead, at least fifteen (15) wire transfers were made within a matter of weeks totaling approximately $150,000,000.

140.    The foregoing low-risk designations were made notwithstanding the fact that Neiswender advised an Oakworth representative working on establishing the account that the Judgment Debtor is moving his funds from Vanguard "to create more flexibility with wires," as Vanguard had "severe limitations."  The "limitations" to which Neiswender referred, of course, were that Vanguard declined to directly wire the funds to Liechtenstein.

141.    If Oakworth had conducted the required AML review of Rocla and Roclab, it would have determined that the entities were merely shell companies with no business purpose at all.

### G.  The Judgment Debtor Liquidates Vanguard Holdings and Transfers the Hidden Assets to Oakworth

142.    From October 10, 2017 through October 13, 2017—approximately two (2) weeks after Vanguard had been served with the 2017 Restraining Notice—the Judgment Debtor liquidated substantially all of his holdings in the Fraudulent Rocla and Roclab Accounts at Vanguard, amounting to approximately $150 million.

143.    As of October 13, 2017, the Judgment Debtor held $140,637,332.09 and $9,825,126.44, respectively, in Vanguard's Federal Money Market Funds for Roclab and Rocla.

144.    On October 18, 2017, Vanguard processed the following wire transfers: (i) a transfer in the amount of $140,636,000 from the Vanguard Federal Money Market Fund for Roclab to Oakworth; and (ii) a transfer in the amount of $9,824,000 from the Vanguard Federal Money Market Fund for Roclab to Oakworth.  These transfers were followed by a series of smaller transfers in October, November and December 2017, totaling approximately $411,000.00

(collectively, the "Vanguard Transfers").

145.    The Vanguard Transfers were made just over two weeks after Vanguard was served with the 2017 Restraining Notice, which required Vanguard to restrain the very accounts from which the Vanguard Transfers were made.

146.    The Vanguard Transfers were routed through HSBC Bank USA, N.A., in New York.

147.    There were numerous red flags that should have triggered an AML investigation into the Vanguard Transfers. Vanguard's AML transaction monitoring system, if operating appropriately, would have alerted Vanguard to the following facts:

- The entirety of two (2) extremely large investment accounts, totaling approximately $150 million, were liquidated for no identifiable business purpose.

- The accounts were liquidated over the course of only three (3) days.

- Less than one week after liquidating the accounts, the Judgment Debtor requested that Vanguard transfer virtually *all* of the liquidated assets to a small local bank in Alabama, a place where the account-holding entities, Rocla and Roclab, had no business purpose for maintaining accounts.

148.    Given all that Vanguard knew, it should have alerted law enforcement authorities and refused to transfer the funds as requested.  Instead of restraining the funds in light of this highly suspicious activity, Vanguard intentionally routed the money to a bank willing to assist the Judgment Debtor in the Scheme to hide his assets overseas when Vanguard had declined to effectuate the overseas transfers itself.

149.    Under the legal doctrine of collective knowledge, *the entire institution is charged with knowledge of information received by any department*, including the knowledge of the Judgment and the 2017 Restraining Notice, the Judgment Debtor's goal of moving the funds overseas, as well as any information found as part of an AML review.  Vanguard cannot, therefore,

claim ignorance for its failure to restrain the funds.

150.    Vanguard's actions alleged herein, including, but not limited to, opening the Fraudulent Rocla and Roclab Accounts and agreeing to liquidate and transfer the Judgment Debtor's holdings to Oakworth (and, ultimately, out of the country), give rise to a strong presumption of Vanguard's complicity in the Scheme.

**H.  Oakworth Transfers the Judgment Debtor's Assets to Liechtenstein**

151.    Oakworth opened the Oakworth Rocla and Roclab Accounts knowing that the Judgment Debtor intended to transfer the funds overseas shortly thereafter.  It acted as a conduit, knowing from the start that it was helping the Judgment Debtor to move money out of the United States to defraud creditors.

152.    As part of its AML CIP account opening process, Oakworth is required to ascertain the source of funds and the customer's intentions.  Upon learning what the Judgment Debtor intended, Oakworth should have refused to open the Oakworth Rocla and Roclab Accounts.  The simplest of Google searches would have disclosed the existence of the Judgment.

153.    The fact that Oakworth held total customer assets of only approximately $500 million in 2017, its acquisition of $150 million from the Judgment Debtor should have also raised questions from an AML perspective.

154.     On October 24, 2017, shortly after Oakworth received the Vanguard Transfers, a meeting was apparently scheduled among several Oakworth representatives, with the subject of "large deposit."  This means that the accounts were already identified as unusual and problematic.  Instead of looking further into the issue, the next day, the meeting was cancelled.  Upon information and belief, no subsequent meeting was scheduled among Oakworth officers or employees to discuss the transfers from Vanguard.

155.    Less than two (2) weeks later, the Judgment Debtor directed Oakworth to wire approximately $150 million to an account based in Liechtenstein (the "Liechtenstein Account"), through fifteen (15) separate wire transfers of approximately $10 million each (the "Oakworth Transfers").

156.    Had Oakworth's AML program been functioning properly, this instruction—and particularly the instruction to wire the funds in smaller increments—would certainly have generated an AML alert, as it constitutes highly unusual activity with no apparent business purpose so soon after having been transferred to Oakworth.  A full investigation should have been conducted.

157.    The Oakworth Transfers were made over the course of several weeks, beginning on or about November 6, 2017.  At no point were the transfers halted by Oakworth.

158.    The Oakworth Transfers were routed through TIB – the Independent Bankers Bank, located in Texas, and through Citibank, located in New York.

159.    Upon information and belief, Oakworth was aware, based on its close relationship with Neiswender and communications with the Judgment Debtor, that the Judgment Debtor intended to use the Oakworth accounts to hide his assets from creditors.

160.    Oakworth was also aware that the Oakworth Transfers were far out of the norm for the types of transactions the Judgment Debtor had been conducting in his previously opened accounts.

161.    Internal email communications show that employees of Oakworth expressed to senior officials at Oakworth their concern and hesitancy to process the requested wire transfers of such large sums of money, undoubtedly because the activity was so suspicious.  Oakworth's senior officials ignored their concerns.

162.    Upon information and belief, senior officials at Oakworth directed their employees to process the transactions despite those employees' reservations.

163.    The Oakworth Transfers flew in the face of the "low" risk rating that had been assigned to the Oakworth Rocla and Roclab Accounts.  The risk rating had been based at least in part on the fact that a "low" volume of transfers, between zero and three (3), were expected to take place in the account.  Instead, within a few weeks of the account being opened there were at least fifteen (15) transfers in a short period.   The low-risk rating was also based on the expectation of small amounts of monthly cash deposits and withdrawals of $1,000 to $5,000. Instead, $150,000,000 was deposited and then transferred out within a matter of weeks.  This activity, which did not comport at all with the recent account opening documentation, should have triggered an immediate investigation, and the risk rating of the account should have been immediately increased to high.

164.    Even after the Oakworth Transfers, Oakworth continued to execute suspicious transfers of substantial funds into and out of the Judgment Debtor's various entity accounts (Rocla, Roclab, PBIA, IAS, ATB, and IDAJ), including transfers to offshore accounts, and to issue bank checks, all of which should have raised significant questions and resulted in appropriate inquiries.

165.    For example, on December 27, 2017, the Judgment Debtor directed Oakworth to transfer $257,436.51 from the Roclab account to the ATB account, and then immediately transfer the funds from the ATB account to the PBIA account.  The Judgment Debtor explained that he must "follow those instructions in order to comply with the blizzard of instructions I get from counsel in order to keep our friends in Washington happy!"  Oakworth should have investigated the business purpose of these transfers.  Had Oakworth done so, it would have seen that the activity was classic money laundering, with funds being moved quickly from account to account to

obfuscate the origin and to make the money more difficult to trace.

166.    Throughout December, the Judgment Debtor directed multiple other wire transfers and issuance of bank checks, including: (i) the December 18, 2017 transfer of $347,254 from the Roclab account to the ATB account, followed by the issuance of two (2) bank checks from that account payable to the U.S. Treasury and Sirote & Permutt, PC (the name of Neiswender's firm at the time); (ii) the December 19, 2017 transfer of $47,424.00 from the Rocla account to the PBIA account, followed by issuance of two (2) bank checks from that account to the Residences at Sloan Curve and to UBS Bank USA, requesting that the payor's name not be included; (iii) the December 28, 2017 issuance of a check from the PBIA account payable to "Julian M. Herman," explaining to Oakworth that this is his "official legal name;" and (iv) the December 29, 2017 transfer of $109,960 from the Roclab account to an account at Asiaciti Trust Pacific Limited in Hong Kong.

167.    On or about January 19, 2018, following the rash of transfers, the Judgment Debtor closed the Oakworth Rocla and Roclab Accounts, as well as those of IAS PBIA IDAJ, and ATB & Co.  The Judgment Debtor no longer had a need for those accounts having achieved his goal of moving the bulk of his funds overseas, with Oakworth's overt participation.

168.    Rocla and Roclab were terminated as corporate entities under South Dakota law, effective July 1, 2021.

The Articles of Termination of Rocla and Roclab were executed by "authorized representatives" Rebecca Puni and Eleanora Story Raita.  Upon information and belief, both are employees of Asiaciti Trust Pacific Limited, located in the Cook Islands.

169.    Upon information and belief, the Judgment Debtor maintains accounts with Asiaciti Trust Limited as part of the Scheme to conceal his assets.

### I.  **The Fraudulent Encumbrance of the Judgment Debtor's Real Property**

170.    While the Judgment Debtor, Neiswender, Vanguard and Oakworth engaged in a coordinated effort to conceal the Judgment Debtor's liquid assets, the Judgment Debtor and Neiswender conspired with nonparty Daniel T. Lounsbury ("Lounsbury") to execute another part of the Scheme—to fraudulently encumber the Judgment Debtor's real property.

171.    The most valuable of the Judgment Debtor's properties was the Manhattan apartment building located at 952 Fifth Avenue, ("952 Fifth"), one of the six properties that he had stolen in 1998 from the 1990 Trust and the 1991 Trust.

172.     In 2004, the Judgment Debtor deeded 952 Fifth to Windsor Plaza LLC ("Windsor Plaza"), a New York limited liability company that he owned and controlled.

173.    On July 17, 2015, following the entry of the Liability Default against the Judgment Debtor in the 2011 Action, the court granted Plaintiffs a temporary restraining order enjoining the Judgment Debtor from assigning or leasing 952 Fifth, except as to residential apartment leases for no more than two years.

174.    On August 28, 2017, one month before the entry of the Judgment, the Judgment Debtor recorded a lease memorandum (the "Lease Memorandum"), providing notice of a purported 99-year lease between Windsor Plaza, as lessor, and RFS, as lessee, for a duplex apartment at 952 Fifth (the "Lease") valued at that time at approximately $14.6 million.  RFS was owned and controlled by the Judgment Debtor.

175.    Although the Lease was dated March 1, 2012, upon information and belief it was executed in or around February 2017.

176.    Also on August 28, 2017, the same day that the Lease Memorandum was recorded, the Judgment Debtor filed an Assignment and Assumption of Lease (the "Lease Assignment"),

purporting to assign the Lease from RFS to TPG Global LLC ("TPG"), a Florida limited liability company owned and controlled by Lounsbury.

177.    The Judgment Debtor testified during his deposition that he has known Lounsbury since at least 2014.

178.    Although the Lease Assignment is dated 2014, upon information and belief it was executed in or around February 2017.

179.    No New York Real Property Transfer Tax was paid in connection with the purported assignment and, upon information and belief, no consideration was provided by TPG to RFS.

180.    The Judgment Debtor, Neiswender and Lounsbury conducted similarly fraudulent transactions with respect to the Judgment Debtor's second residence in Aspen, Colorado (the "Aspen Residence").

181.    The Judgment Debtor purchased the Aspen Residence in 2004, and in 2007 transferred it to the J. Maurice Herman Revocable Trust (the "Revocable Trust").

182.    On or about October 28, 2015 and November 9, 2015, respectively, after the Supreme Court had entered the Liability Default striking the Judgment Debtor's pleadings, the Judgment Debtor caused the Revocable Trust to obtain two (2) loans secured by the Aspen Residence; one from UBS Bank USA ("UBS Bank") in the amount of $2,960,000, and the second from Alpine Bank in the amount of $320,000.

183.    At the time that the Judgment Debtor obtained the UBS Bank loan, he held nearly $150 million in liquid assets in accounts at UBS, and therefore had no need for the UBS Bank and Alpine Bank loans.

184.    On or about January 19, 2016, one month after the Appellate Division unanimously

affirmed the Liability Default, the Judgment Debtor caused Marstack to transfer the Aspen Residence to his alter-ego, PBIA, for no consideration.

185.    On or about May 6, 2016, the Judgement Debtor, with Neiswender's assistance, formed a Delaware entity known as JMH Resources LLC ("JMH Resources"), and a South Dakota limited liability company known as Midstates Lending LLC ("Midstates Lending").

186.    On or about May 10, 2016, Lounsbury, with Neiswender's assistance, formed a Wyoming limited liability company known as Southwest Financial Services LLC ("Southwest Financial"). The Articles of Organization are signed by Neiswender. .

187.    Also in or about May 2016, Lounsbury, with Neiswender's assistance, formed a Delaware limited liability company known as DTL Holdings LLC ("DTL Holdings").

188.    By loan agreement dated August 1, 2016, Southwest Financial extended a $1.5 million line of credit to JMH Resources secured by, *inter alia*, mortgages on the Aspen Residence and the Judgment Debtor's residence in Palm Beach, Florida.

189.    On that same date, Midstates Lending loaned DTL Holdings the sum of $500,000.

190.    When asked at a deposition what the business purpose was of simultaneous loans from the Judgment Debtor to Lounsbury and Lounsbury to the Judgment Debtor, the Judgment Debtor could not articulate one.

191.    On November 9, 2017, the Judgment Debtor caused PBIA to obtain a loan from Alpine Bank in the amount of $1 million, secured by a deed of trust on the Alpine Residence. The loan agreement was signed by the Judgment Debtor on behalf of PBIA.

192.    In total, despite the fact that the Judgement Debtor had more than $150 million in liquid assets, the Judgment Debtor, with the aid of Neiswender and Lounsbury, withdrew $5,780,000 in equity from the Aspen Residence by virtue of the various loans after the date of the

entry of the Liability Default.

193.    The formation of Southwest Financial, DTL Holdings, JMH Resources, and Midstates Lending, by the Judgment Debtor, Neiswender and Lounsbury, and the loans entered into by and between those entities, were part of the Scheme, undertaken for the common purpose of shielding the Judgment Debtor's assets from the Plaintiffs.

**J.    The 2021 Information Subpoena and Subpoena *Duces Tecum***

194.    On December 11, 2019, Plaintiffs took the Judgment Debtor's deposition in Florida.

195.    Plaintiffs questioned the Judgment Debtor concerning numerous entities, including Rocla and Roclab.

196.    The Judgment Debtor testified falsely under oath that he had no relationship to Rocla and Roclab.

197.    During his deposition, the Judgment Debtor read a prepared statement that he refused to testify regarding trusts or business entities not established under the laws of Florida and without assets in Florida.  Upon information and belief, the Judgment Debtor's statement reflected the advice received from Neiswender to both hide his assets and perpetuate the Scheme.

198.    In August 2020, based upon, *inter alia*, information learned in connection with a subpoena to UBS, Plaintiffs served the Judgment Debtor with a Notice of Intent to serve a subpoena on Vanguard in Florida.  The subpoena was issued, over the Judgment Debtor's objection, in October 2020 (the "Vanguard Florida Subpoena").

199.    Vanguard objected to the Vanguard Florida Subpoena on jurisdictional grounds and produced only minimal documents.

200.    On February 9, 2021, Plaintiffs served a second information subpoena on Vanguard

in New York (the "2021 Information Subpoena").

201.     Vanguard served a response to the 2021 Information Subpoena dated May 25, 2021, and a supplemental response dated July 7, 2021 (collectively, the "2021 Information Subpoena Response").

202.     Question No. 9 on the 2021 Information Subpoena queried, "does Vanguard have, or did it ever have, any account held by or in the name of any of the following entities:  Reloam, LLC, Entity A, LLC, Entity B, LLC, Entity C, LLC, Rocla, LLC, Roclab, LLC, Roclac, LLC, Halec, LLC."

203.     Question No. 10 on the 2021 Information Subpoena requested certain information for each such account, including authorized signatories, opening date, closing date, and disposition of the account holdings.

204.     In response, Vanguard listed the Judgment Debtor as "Signator[ies]" to the Fraudulent Rocla and Roclab Accounts, and further admitted that those accounts were in existence at the time of the service of the 2017 Restraining Notice and 2017 Information Subpoena.

205.     Plaintiffs' receipt of Vanguard's 2021 Information Subpoena Response was the first time Plaintiffs became aware of the existence of the Fraudulent Rocla and Roclab Accounts.

206.     On August 13, 2021, Plaintiffs served a subpoena *duces tecum* on Vanguard in New York (the "2021 Subpoena *Duces Tecum*") requesting, *inter alia*, all documents concerning the opening and closing of the "Maurice Herman Accounts," which was defined therein to include "any account for which the Judgment debtor is or was a signatory, exercised control and/or was a beneficial owner."

207.     The 2021 Subpoena *Duces Tecum* further requested documents and communications relating to: (i) any internal reviews conducted with respect to any accounts

34

connected with the Judgment Debtor; (ii) any investigation conducted into the source of funds deposited into such accounts; (iii) any fraud investigations conducted in connection with specific transactions or activity in such accounts; (iv) any alerts generated by any transaction monitoring or other AML system; and (v) Vanguard's policies and procedures relating to AML compliance, account opening, and customer due diligence (collectively, the "AML Document Requests").

208.    In response to the 2021 Subpoena *Duces Tecum*, Vanguard for the first time produced documents (the "Vanguard Production") that confirmed the Scheme, contrived by Judgment Debtor and Neiswender and carried out in cooperation with Vanguard and Oakworth to liquidate, and ultimately transfer offshore, the Judgment Debtor's (ill-gotten) staggering assets in the names of sham entities to evade Plaintiffs' efforts to enforce the Judgment.  This information directly contradicted Vanguard's response to the 2017 Information Subpoena.

209.    In particular, the documents reveal that: (i) Vanguard opened the First Rocla and Roclab Accounts, at the Judgment Debtor's and Neiswender's request, under the Judgment Debtor's legal name and Social Security number; (ii) one day later, at the Judgment Debtor's and Neiswender's request, Vanguard closed those accounts; (iii) approximately one week after that, at the Judgment Debtor's and Neiswender's request, Vanguard opened the Fraudulent Rocla and Roclab Accounts based upon documentation containing a barely-concealed alias and false Social Security number; (iv) Sirote advised Vanguard in writing that Vanguard should not in any way associate the Judgment Debtor with the accounts; (v) Vanguard, in May 2016, directed the Judgment Debtor to resubmit a form seeking wire transfer authority, changing his signed name from "Julian M. Herman" (his legal name) to "Maurice J. Herman" (his alias); (vi) Vanguard liquidated all of the Judgment Debtor's assets, valued at more than $150 million, in a single day; and (vii) Vanguard transferred that entire sum to Oakworth in a single day, apparently without

conducting any investigation into the suspicious transactions and in direct contravention of the 2017 Restraining Notice.

210.    These actions should have led the AML department to conduct a thorough investigation. An appropriately conducted AML investigation would have immediately uncovered the fraudulent nature of the activity.

211.    Notably, Vanguard did not produce *any documents* responsive to the AML Document Requests, or did they articulate any objection to such requests.

212.    The Vanguard Production further revealed that, as of the date of the 2017 Restraining Notice, the Fraudulent Rocla and Roclab Accounts contained more than sufficient funds with which to satisfy the Judgment. Vanguard facilitated the Judgment Debtor's game of "keep away" with his ill-gotten funds.

213.    Despite its possession of records establishing the Judgment Debtor's interest in the Fraudulent Rocla and Roclab Accounts, Vanguard knowingly failed to restrain those accounts in compliance with the 2017 Restraining Notice, and falsely answered the 2017 Information Subpoena to conceal the existence of those accounts, and the First Rocla and Roclab Accounts, from the Plaintiffs.

214.    Vanguard's concealment of the First Rocla and Roclab Accounts and the Fraudulent Rocla and Roclab Accounts in response to the 2017 Information Subpoena prevented Plaintiffs from taking timely action with respect to those accounts, and allowed the Judgment Debtor to place his assets even further out of Plaintiffs' reach, when they should have been restrained for the benefit of, or at least disclosed to, the Plaintiffs.

215.    Notably, even in its responses to the 2021 Subpoena *Duces Tecum*, Vanguard *continued to conceal* accounts controlled by the Judgment Debtor. Plaintiffs have recently learned

that, beginning in late December 2019 or early January 2020, the Judgment Debtor opened an account at Vanguard in the name of Retliat LLC ("<u>Retliat</u>"), a Delaware entity formed on December 18, 2019.  Throughout 2020, the Judgment Debtor wrote multiple checks from the Retliat account, totaling more than $400,000 (of which Plaintiffs are now aware).  Despite the fact that the 2021 Subpoena *Duces Tecum* requests documents concerning *all accounts* on which the Judgment Debtor "is or was a signatory, exercised control and/or was a beneficial owner," Vanguard inexplicably *failed* to produce any documents concerning the Retliat account.

216.    Based on the foregoing, it appears that Vanguard continued, well into 2021, to participate in the Scheme to conceal the Judgment Debtor's assets.

**FIRST CLAIM FOR RELIEF**
**AGAINST THE JUDGMENT DEBTOR AND VANGUARD**
<u>**Fraud/Fraudulent Misrepresentation**</u>
(incorporating all prior allegations)

217.    The Judgment Debtor, for the specific purpose of hindering Plaintiffs' efforts to enforce the Judgment, willfully and maliciously misrepresented to Plaintiffs that he had no interest in, and conducted no business with, Rocla and Roclab.

218.    The Judgment Debtor, for the specific purpose of hindering Plaintiffs' efforts to enforce the Judgment, willfully and maliciously concealed from Plaintiffs the existence of assets available to satisfy the Judgment, while simultaneously transferring those assets to Vanguard, then Oakworth, and then Liechtenstein.

219.    Vanguard, at the direction of the Judgment Debtor and Neiswender, acting in his capacity as a member and/or shareholder of Sirote, intentionally provided false information, and concealed information, in response to the 2017 Information Subpoena. Vanguard stated that it held a single account in which the Judgment Debtor had an interest or was an authorized signatory within three (3) years of the service of the 2017 Restraining Notice, in the name J. Maurice Herman

Revocable Trust, despite its knowledge of the First Rocla and Roclab Accounts and the Fraudulent Rocla and Roclab Accounts.

220.    Vanguard, at the direction of the Judgment Debtor and Neiswender, knowingly and willfully concealed the existence of the Fraudulent Rocla and Roclab Accounts in its response to the 2017 Information Subpoena, despite its knowledge that the Judgment Debtor was the beneficial owner of, and sole signatory on, those accounts.

221.    In reliance on Vanguard's misrepresentation and omissions, Plaintiffs did not take any further action in 2017 to enforce the 2017 Restraining Notice with respect to the Fraudulent Rocla and Rocla Accounts.

222.    As a result of the Judgment Debtor's and Vanguard's fraud, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with applicable interest thereon.

**SECOND CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**<u>Conspiracy to Commit Fraud</u>**
(incorporating all prior allegations)

223.    Defendants conspired with one another to execute a fraudulent Scheme to conceal the existence of brokerage accounts containing the Judgment Debtor's assets, and to transfer those assets beyond the reach of the Plaintiffs, thwarting Plaintiffs' efforts to enforce the Judgment.

224.    Defendants each willfully and knowingly engaged in one or more overt acts in furtherance of the Scheme, as alleged above.

225.    Neiswender, in the course of his duties as a member and/or shareholder at Sirote, masterminded the Scheme together with the Judgment Debtor, including, upon information and belief, advising the Judgment Debtor to lie during his deposition about the disposition of his assets

and otherwise directing the Judgment Debtor to wrongfully refuse to answer related questions.

226.    Neiswender, as the Judgment Debtor's authorized agent and in the course of his duties as a shareholder at Sirote, formed EntityA, EntityB, Rocla and Roclab as conduits to funnel the Judgment Debtor's assets, with the intent and purpose to defraud Plaintiffs.

227.    The Judgment Debtor and Neiswender conspired to provide false information in connection with the opening of the Fraudulent Rocla and Roclab Accounts and did in fact provide such false information.

228.    Neiswender engaged in the Scheme as a shareholder of Sirote.

229.    Neiswender is listed on Sirote's website as a shareholder, and a member of Dentons' Trusts, Estates and Wealth Preservation practice group.

230.    Neiswender's liability is imputed to Sirote.

231.    Vanguard, based upon its dealings with the Judgment Debtor and Neiswender in connection with the opening of the First Rocla and Roclab Accounts, knew that the information supplied by the Judgment Debtor and Neiswender for the Fraudulent Rocla and Roclab Accounts was false.

232.    The "Know Your Customer" due diligence that Vanguard was required to undertake pursuant to the AML laws would have *confirmed* that the information supplied for the Fraudulent Rocla and Roclab Accounts was false.  Yet Vanguard, in conspiracy with the Judgment Debtor and Neiswender, opened the Fraudulent Rocla and Roclab Accounts in April 2016 without conducting or acting upon such investigation.

233.    Vanguard conspired with the Judgment Debtor, Neiswender, and Oakworth to liquidate the assets in the Fraudulent Rocla and Roclab Accounts and transfer the assets to Oakworth, despite knowing that those assets were subject to the 2017 Restraining Notice, and that

the Judgment Debtor intended to further transfer those assets to Liechtenstein.

234.    Vanguard conspired with the Judgment Debtor, Neiswender, and Oakworth to transfer approximately $150 million of the Judgment Debtor's assets to Oakworth, without first alerting law enforcement officials to the highly suspicious transaction.

235.    Vanguard, in conspiracy with Neiswender, willfully and intentionally withheld information from its response to the 2017 Information Subpoena that would have revealed the existence of the Fraudulent Rocla and Roclab Accounts.

236.    Vanguard conspired with the Judgment Debtor and Neiswender to provide false answers in response to the 2017 Information Subpoena, stating that Vanguard had no record of any account in which the Judgment Debtor had an interest.

237.    Vanguard continued to make suspicious transfers from the Fraudulent Rocla and Roclab Accounts in the weeks following the initial transfers.

238.    Oakworth conspired with Vanguard, the Judgment Debtor and Neiswender to receive the Vanguard Transfers, and soon thereafter to transfer the assets to Liechtenstein, despite its knowledge of the Judgment Debtor's fraudulent purpose.

239.    Oakworth conspired with the Vanguard, the Judgment Debtor, Neiswender to execute on the Judgment Debtor's request, just weeks after receiving the funds, to wire a total of approximately $150 million to Liechtenstein, without first alerting law enforcement officials to the highly suspicious transactions.

240.    The Oakworth Transfers to Liechtenstein occurred over the course of several weeks.

241.    Based upon: (i) Oakworth's longstanding relationship with Neiswender; (ii) the sheer magnitude of the Vanguard Transfers and the Oakworth Transfers; (iii) the clear indicia of

fraud inherent in the transactions; and (iv) Oakworth's apparent failure to heed red flags raised by its employees, Oakworth clearly had knowledge that its actions were in furtherance of the Judgment Debtor's efforts to defraud the Plaintiffs.

242.    Rocla and Roclab conspired with the Judgment Debtor, Neiswender, Vanguard and Oakworth to implement the Scheme by serving as conduits for the laundering of the Judgment Debtor's assets.

243.    The Judgment Debtor conspired with Neiswender to provide false testimony during his 2019 deposition concerning the existence and location of his assets, lying to conceal the Vanguard Transfers and the Oakworth Transfers.

244.    By reason of their conspiracy to defraud Plaintiffs with respect to the existence of bank and brokerage accounts containing the Judgment Debtor's assets, Defendants are jointly and severally liable to Plaintiffs in an amount to be determined at trial, but in no event less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with applicable interest thereon.

**THIRD CLAIM FOR RELIEF**
**AGAINST VANGUARD, OAKWORTH, NEISWENDER,**
**SIROTE, ROCLA and ROCLAB**
**Aiding & Abetting Fraud and/or Fraudulent Concealment**
(incorporating all prior allegations)

245.    As detailed above, Vanguard, Oakworth, Neiswender, Sirote, Rocla and Roclab had knowledge of the Judgment against the Judgment Debtor.

246.    As detailed above, Vanguard, Oakworth, Neiswender, Sirote, Defendants, Rocla and Roclab had knowledge that the Judgment Debtor intended to use the Fraudulent Rocla and Roclab Accounts and the Oakworth accounts to shield his assets from Plaintiffs.

247.    As detailed above, Vanguard, Oakworth, Neiswender, Sirote, Rocla and Roclab

41

rendered substantial assistance to the Judgment Debtor in aid of his efforts to fraudulently conceal his assets from Plaintiffs.

248.    Plaintiffs have been damaged as a result thereof.

249.    By reason of the foregoing, Vanguard, Oakworth, Neiswender, Sirote, Rocla and Roclab are jointly and severally liable to Plaintiffs in an amount to be determined at trial, but in no event less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with interest from the date of the accrual of the claim.

**FOURTH CLAIM FOR RELIEF**
**AGAINST THE JUDGMENT DEBTOR, ROCLA AND ROCLAB**
**Declaratory Judgment/Alter Ego Liability/Pierce the Corporate Veil**
(incorporating all prior allegations)

250.    After the Supreme Court defaulted the Judgment Debtor for liability in the 2011 Action, Neiswender and the Judgment Debtor formed Rocla and Roclab for the specific purpose of shielding the Judgment Debtor's assets from Plaintiffs and to avoid paying the Judgment.

251.    The sole member and manager of Rocla was EntityA, whose sole member and manager was Neiswender.

252.    The sole member and manager of Roclab was EntityB, whose sole member and manager was Neiswender.

253.    The sole authorized signatory on the Fraudulent Rocla and Roclab Accounts at Vanguard was the Judgment Debtor.

254.    Upon information and belief, the sole authorized signatory on the Rocla and Roclab accounts at Oakworth was the Judgment Debtor.

255.    Upon information and belief, neither Rocla nor Roclab had any legitimate business operations, and existed solely for the purpose of perpetrating a fraud on Plaintiffs.

256.    The Judgment Debtor directed the transfer of his assets from the UBS brokerage

accounts to the Fraudulent Rocla and Roclab Accounts at Vanguard.

257.    The Judgment Debtor directed the transfer of his assets from the Fraudulent Rocla and Roclab Accounts to Oakworth.

258.    Upon information and belief, the Judgment Debtor directed the transfer of his assets in the Oakworth accounts to the Liechtenstein Account.

259.    The Judgment Debtor exercised complete domination over Rocla and Roclab with respect to the formation of the entities, the UBS Transfers, the Vanguard Transfers, and the Oakworth Transfers.

260.    The Judgment Debtor's domination of Rocla and Roclab was used to defraud Plaintiffs by shielding his assets from enforcement of the Judgment.

261.    The Judgment Debtor's domination over his assets titled in the names of these two (2) alter-ego entities continued unabated until their legal existence was extinguished.

262.    Rocla and Roclab were merely alter egos of the Judgment Debtor.

263.    Based upon the foregoing, Plaintiffs are entitled to a declaratory judgment piercing the corporate veils of Rocla and Roclab, and declaring that the assets of Rocla and Roclab, wherever and in whatever form they may be held, belong to judgment creditors and may be used to satisfy the Judgment against the Judgment Debtor.

**FIFTH CLAIM FOR RELIEF**
**AGAINST THE JUDGMENT DEBTOR**
**<u>Order of Repatriation Pursuant to F.R.C.P. 69(a) and New York Law</u>**
(incorporating all prior allegations)

264.    Following entry of the Judgment, in or about November 2017, the Judgment Debtor transferred approximately $150 million from the Oakworth Rocla and Roclab Accounts to an account located in Liechtenstein.

265.    Upon information and belief, the Judgment Debtor continues to hold his assets in

one or more offshore accounts located in Liechtenstein, the Cook Islands, Nevis, and/or Hong Kong, among other foreign jurisdictions.

266.    This Court has personal jurisdiction over the Judgment Debtor, and therefore has the authority to order the Judgment Debtor to repatriate assets held outside of the United States.

267.    Based on the foregoing, Plaintiffs are entitled to an order directing the Judgment Debtor to repatriate and pay to Plaintiffs funds sufficient to satisfy the Judgment.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a) on the first claim for relief for relief against the Judgment Debtor and Vanguard for fraud and/or fraudulent concealment, in an amount to be determined at trial, but in no event less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with applicable interest thereon;

b) on the second claim for relief against all Defendants for conspiracy to commit fraud and/or fraudulent concealment, in an amount to be determined at trial, but in no event less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with applicable interest thereon;

c) on the third claim for relief for relief against Vanguard, Oakworth, Neiswender, Sirote, Rocla and Roclab for aiding and abetting fraud, in an amount to be determined at trial, but in no event less than the Judgment amount, less sums previously recovered in partial satisfaction of the Judgment, together with interest from the date of the accrual of the claim;

d) On the fourth claim for relief against the Judgment Debtor, Rocla and Roclab, for a declaratory judgment piercing the corporate veils of Rocla and Roclab, declaring that their assets may be used to satisfy the Judgment against the Judgment Debtor;

e) On the fifth claim for relief against the Judgment Debtor, for an order directing the Judgment Debtor to repatriate, and pay to Plaintiffs, funds sufficient to satisfy the Judgment; and

f)   for such other and further relief as this Court deems just and proper.

Dated: Garden City, New York
        January 30, 2024

                                    JASPAN SCHLESINGER NARENDRAN  LLP
                                    Attorneys for Plaintiffs


                        By:    /s/Steven R. Schlesinger
                               STEVEN R. SCHLESINGER
                               GAYLE S. GERSON
                               300 Garden City Plaza, 5th Floor
                               Garden City, New York 11530
                               (516) 746-8000